Use of JOHN C. HIGGINS, use of The Wilmington and North-
ern Railroad Company, The Wilmington and Reading Rail-
road Company. v. JAMES C. DOWNWARD & SONS.

*Corporations — Railroad — Mortgage and Sale of Franchises
Revocation of Charter.*

The Wilmington & Reading Railroad Company was incorporated under the laws of
the State of Pennsylvania and the laws of the State of Delaware. Under a
decree of the Circuit Court of the United States all the railroad of said com-
pany, and all its rights, privileges, immunities, and franchises, with exception
of those granted by the State of Delaware, were sold to satisfy a mortgage
against the same. The Act of the Legislature of the State of Delaware per-
mitted the mortgaging of real estate only. Afterwards the legislature of Dela-
ware incorporated the purchasers of said railroad at said sale, and vested them
with all the right, title, interest, property, possession, claim, and demand at
law or in equity of, in, and to such railroad, with its appurtenances, and with
all the rights, powers, immunities, privileges, and franchises of the corporation
as whose property the same was sold, and which may have been granted there-
to or conferred thereupon by any act or acts of Assembly whatsoever in force at
the time of such sale. *Held*, that said act did not revoke the charter of the
Wilmington & Reading Railroad Company, nor did it vest in the new com-
pany title to a judgment obtained by the old company, which was not covered
by the mortgage under which the road was sold.

(*June 20, 1888.*)

CASE STATED from the Superior Court of New Castle
County.

The Wilmington and Reading Railroad Company was a cor-
poration existing under and by virtue of legislation in the States of
Delaware and Pennsylvania. The act to incorporate the Wilming-
ton and Brandywine Railroad Company was passed by the Legis-
lature of Delaware, March 5, 1861, (12 *Del. Laws*, 136,) to author-
ize the construction of a railroad from some point within or near
Wilmington, to the line of the State, in the direction of Parkes-
burg in the State of Pennsylvania. The Delaware act also, (Sec.

17,) indicated the expectation of an incorporation by the Legislature of Pennsylvania, of a company to construct a railroad from Parkesburg, Coatesville or Downingtown, to the State line, to unite with the Wilmington and Brandywine Railroad, and that section granted in very general terms a power to the latter company to unite with such Pennsylvania Company.

In 1864, the Legislature of Pennsylvania incorporated the Berks and Chester Railroad Company. The Legislature of Delaware, February 2, 1865, passed a supplement to the charter of the Wilmington and Brandywine Railroad Company, (12 *Del. Laws,* 539,) changing the name of the corporation to the "Delaware and Pennsylvania State Line Rail Road Company." In the following month, Pennsylvania by supplement to her general railroad act, authorized the consolidation of her corporations with those of other states, but this act being confined to roads then organized and operating, did not include the Berks and Chester Road, which was not then in that condition. At the following session of the Delaware Legislature, a supplement was passed to the charter of the Delaware corporation, authorizing it to consolidate and merge with the Pennsylvania corporation under substantially the same terms and conditions as were provided by the general law of Pennsylvania. This act was passed February 7, 1866, (13 *Del. Laws,* 46.) In the following month the State of Pennsylvania gave special authority to the Berks and Chester Road to consolidate with the Delaware corporation. The consolidation was, in fact, effected and the new corporation was entitled "The Wilmington and Reading Railroad Company," as appears by the recital of an act passed by the Legislature of Delaware, February 25, 1867, granting to the new corporation certain additional authority with respect to the location of its railroad in connection with the Delaware River and the construction of lateral railroads turnouts, &c. The Pennsylvania general legislation is not included in the case stated, not being material to the questions at present under consideration; but the dates of all the acts passed in that State, are referred to here simply in connec-

tion with the Delaware legislation, in order to illustrate and make clear the general course of legislation, under which the company finally existed.

The only other act of legislation in Delaware in relation to this company was an act passed April 4th, 1873, (14 *Del. Laws,* 558,) relating solely to the construction of branch roads and a bridge over the Christiana River.

The Wilmington and Reading Railroad Company being so in existence as a corporation partly of the State of Delaware, made an issue of bonds to the amount of $1,250,000, secured by mortgage, both being dated March 3, 1868. This mortgage is a part of the case stated and was undoubtedly intended to cover the railroad and all the property of the company which, under the authority of its charter and supplements thereto it had power to mortgage. What this included is precisely the subject presented to the Court in this case. More than three years prior to the date of the mortgage, the Wilmington and Reading Railroad Company had recovered judgment in the Superior Court of New Castle County at the November Term, 1869, against James Downward & Sons. Upon this a *fi. fa.* was issued to the November Term, 1870, and a return made of "Levied on goods and chattels." No further proceeding was had under the judgment until the May Term, 1886, when a new series of executions were issued, culminating in the sale, to set aside which a rule was granted in the Superior Court.

Default having been made in the payment of interest on the bonds secured by the mortgage, foreclosure proceedings were taken in the Circuit Court of the United States for the Eastern District of Pennsylvania, commenced by the filing of a bill in October, 1875, and terminating in the sale of the road on Octboer 2, 1876, which sale was returned and confirmed, and under the order of the Court a deed for the property sold was made to the purchasers on January 6th, 1877.

By an act passed February 22, 1877, the Legislature of Delaware after reciting the sale of the railroad of the Wilmington and

Reading Railroad Company, proceeded to incorporate the purchasers and to constitute them a body politic and corporate by the name of the Wilmington and Northern Railroad Company and thereupon vested in the new corporation "all the rights, powers, immunities, privileges and franchises" of the Wilmington and Reading Railroad Company. After the passage of this act, the surviving grantees in the deed to the purchasers and the executors of one who had died, conveyed the railroad to the new corporation.

The contention of the defendant in the rule is, that, by virtue of the mortgage and the foreclosure proceedings, the Wilmington and Northern Railroad Company became vested with a right and title to the judgment against Downward & Sons and is entitled to recover the fruits of this judgment by virtue of the executions issued.

The contention of the plaintiff in the rule is that, by virtue of the proceedings referred to, no right or title to the judgment passed to the new corporation; that the legal existence of the Wilmington and Reading Railroad Company was terminated by the General Assembly, under the act last recited, and that all its corporate powers, privileges and franchises were vested in the new corporation; that therefore there is now no existing plaintiff.

The questions as formulated in the case stated are:

First.   Whether the judgment set forth in the case stated being No. 181 to the November Term, 1869, of the said Superior Court, is a valid and subsisting judgment.

Second.   If the said judgment is a valid and subsisting judgment, did the title to the same pass to the Wilmington and Northern Railroad Company, by virtue of the acts of Assembly, mortgage, foreclosure proceeding sale and conveyances recited, in the case stated, so as to give the said Wilmington and northern Railroad Company the right to enforce said judgment by execution issued against the defendant.

*Anthony Higgins,* for the plaintiff.

THE WILMINGTON AND READING RAILROAD COMPANY IS
STILL AN EXISTING CORPORATION.

. 1.—The franchises of said company were not sold under the
decree of foreclosure but subsist in said company to-day, the power
given by its charter to mortgage its property containing no power
to mortgage its franchises.

(1.)   The language of Vol. 12, Laws of Delaware, Chap. 88,
Pages 136–137, Sec. 2, is :

"And by the same name the subscribers    *    *    *
shall be able to purchase, receive, have, hold and enjoy to them and
their successors, lands, tenements and hereditaments, goods, chattels,
and all estate, real, personal and mixed, of what kind or quality
soever, and the same from time to time to sell, *mortgage,* grant,
alien or dispose of."

(2.)   By the decree of foreclosure made by the U. S. Circuit
for the Eastern District of Pennsylvania, it appears (*a*) that the
court found that thesaid mortgage was a first lien upon the railroad
of said company, "*except upon the franchises of said company,
under grant from the State of Delaware;*" (*b*) ordered a sale by the
Trustees of the property of the company; (*c*) that said Trustees
exposed the same to sale; (*d*) that the Court confirmed said sale
and ordered a deed by the Trustees to the purchasers; (*e*) and that
the Trustees made the deed to the purchasers thereof in each in-
stance, "*exclusive of the franchises granted by the State of Dela-
ware.*"

It thus appears that while the railroad and property of the
company was sold under these proceedings, that its franchises,
granted by the state of Delaware, never were aliened from it,

and that for the reason that the Legislature of Delaware, by not granting it the power to mortgage the franchises granted it by the State, intended that the company should never be deprived of its franchises, and therefore that they subsist in the company to-day.

It further appears by said decree that the several defendants in their answers denied that the mortgage was a lien on the Delaware franchises. So that that question is *res adjudicata.*

2. The existence of the company was not terminated by the mortgage and sale thereunder of all its corporate property and by discontinuing its business or by insolvency.

2 Kent Comm., 309 ; *Angell & Ames on Corp.,* Sect. 770 ; *Pierce on Railroads,* 10 ; 2 *Morawetz on Priv. Corp.,* 1008–1010 ; *Micklas v. Rochester City Bank,* 11 Paige, 118 ; *Boston Glass Manufactory Co. v. Langdon,* 24 Pick., 49 ; *Coburn v. Boston Mfg. Co.,* 10 Gray 244 ; *Germantown Pass. R. Co. v. Fitler,* 60 Pa., 124–132 ; *Town v. Bank of River Raisin,* 2 Doug. Mich., 530 ; *Folger v. Columbian Ins. Co.* 99 Mass., 267.

A railroad corporation is not dissolved by sale upon execution of a part or the whole of their road.

*State v. Rives,* 5 Ire., 309 ; *Commonwealth v. Tenth Mass. Turnp. Co.,* 5 Cush., 509 ; *Ang. & Ames on Corp.,* 773, p 755 ; 2 *Redfield on Railways,* 539.

Nor by a sale to another corporation, which sale is authorized by an Act of the Legislature.

*Lauman v. Lebanon Valley R. Co.,* 30 Pa. St., 42 ; *Bruffet v. Great Western R. Co.,* 25 Ill., 310.

The same identical franchise, that has before been vested in one, cannot be bestowed on another, for that would prejudice the former grant.

2 Blackst. Comm., 37 ; *Dartmouth College v. Woodward,* 4 Wheat., 663.

Nor by neglecting to elect directors and officers.

2 Kent, Comm., 309 ; *Pierce on Railroads,* 10 ; 2 *Morawetz*

*Priv. Corp.*, 1008 ; *Regina v. Ballivos*, 1 P. Wms., 207 ; *Mayor of Colchester v. Seaber*, 3 Burr., 1866 ; *Commercial Bank v. Lockwood*, 2 Harring., 8 ; *Slee v. Bloom*, 5 Johns, Ch., 366, 377 ; *Phillips v. Wickham*, 1 Paige, Ch., 590, 596 ; *Pierce v. Boston Copper Co.*, 15 Pick., 351 ; *Evarts v. Killingsworth Manufg. Co,*, 20 Conn., 448 ; *Lehigh Bridge Co. v. Lehigh C. & N. Co.*, 2 Rawle, 823.

Until new officers shall be chosen the officers last elected hold over.

*Sparks v. The Farmers' Bank*, 3 Del. Ch., 296.

The stockholders compose the company ; and the manager, or directors and officers, are their agents, necessary for the management of the affairs of the company, but not essential to its existence as such, and not forming an integral part. The corporation exists per se so far as is requisite to the maintenance of perpetual succession and the holding and preserving of its franchises.

*Angell & Ames on Corp.*, Sect., 771.

Wherever, therefore, the corporation may restore itself by a new election, though until the new election the rights of the corporators may be suspended, yet they are not extinguished.

*Angell & Ames on Corp.*, Sect., 770, p. 750 ; *Phillips v. Wickham*, 1 Paige, 597.

3. The Company cannot be deemed dissolved by reason of any misuser or non-user of its franchises, unless such default has been judicially ascertained and declared in a direct proceding instituted for that purpose to declare it forfeited.

2 *Kent*, 312 ; *Pierce on Railroads*, 11 ; *The King v. Amery*, 2, T. R., 515 ; *Slee v. Bloom*, 5 Johns, Ch., 379 ; *University of Md., v. Williams*, 9 Gill a J., 421.

4. The same authorities establish the proposition that a cause of forfeiture which has not been judicially declared in a direct proceeding cannot be taken advantage of collaterally.

*Dyer v. Walker*, 40 Penn. St., 157.

5.  The said company has never terminated its existence by the surrender of its charter, or by its acceptance by the State. A corporation cannot surrender its charter without some solemn act of the corporation for that purpose, and a surrender will not be of avail until accepted by the government.

*Boston Glass Manufactory Co. v. Langdon,* 24 Pick., 49 ; 2 *Morawetz Priv. Corp.,* 1011 ; 2 *Kent* 310 ; *Pierce on Railroads,* 10.

6.  The act incorporating the Wilmington and Northern Railroad Company did not repeal the charter of the Wilmington and Reading Railroad Company.

(1.)  The act does not in terms expressly repeal the charter of the Reading Company, and the Court will not construe it to imply such a repeal.

Repeals of statutes by implication are things disfavored by law, and never allowed of, but when the inconsistency and repugnancy are plain and unavoidable.

19 *Vin. Abr.,* 525, *Pl.,* 132.

When it is manifestly the intention of the Legislature that a subsequent Act shall not control the provisions of a former Act, the subsequent Act shall not have such operation, even though the words of it, taken strictly and grammatically, would repeal the former Act.

6 *Bac. Abr.,* 384–385 ; *Canal Co. v. Railroad Co.,* 4 G. & J., 152 ; *Williams v. Pritchard,* 4 I. R., 2 ; *Preston v. Browden,* 1 Wheat., 115 ; *Angell & Ames on Corp.,* Sect., 767 ; *People v. Oakland Co. Bank,* 1 Dong. Mich., 286.

While the power of the Legislature to revoke corporate charters is reserved by the constitution, the Legislature cannot exercise this power " from whim or caprice and without cause," and this can be done only " upon examination and trial before the Legislature upon grounds stated."

*The Delaware R. R. Co. v. Tharp,* 5 Harring., 454 ; *Common-*

*wealth v. Essex, Co.* 13 Pick., 253; *Detroit v. Detroit Pl. Road Co.,* 43 Mich., 147; *Railroad Co. v. Maine,* 96 U. S., 511; 3 *Wood's Railway Law,* Sect., 493.

Even the consolidation of two companies does not necessarily work a dissolution of both, and the creation of a new corporation. Whether such be its effect depends upon the legislative intent manifested in the statute under which the consolidation takes place.

*Central R. Banking Co. v. Georgia,* 92 U. S. 665.

A change in the charter of a municipal corporation in whole or in part, by an amendment of its provisions, or the substitution of a new charter in place of an old one, embracing substantially the same corporators and the same territory, will not be deemed in the absence of express legislative declaration otherwise to affect the identity of the corporation or to relieve it from its previous liabilities, although different powers are possessed under the amended or new charter and different officers administer its affairs.

*Broughton v. Pensacola,* 93 U. S., 266.

(2.) Even if the act did repeal the charter, such repeal did not so dissolve the corporation of the Reading Company as to extinguish this judgment and the debt is secured.

*Greenwood v. Freight Co.,* 105 U. S., 13–19; *Detroit v. Detroit Pl. Road Co.,* 43 Mich., 147; *Railroad Co. v. Maine.,* 96 U. S., 511.

The present Wilmington and Northern Railroad Company had a perfectly good title to said judgment by reason of the mortgage (which in fact and under the power given in the charter included all the personal property of the Wilmington and Reading Company), the foreclosure proceedings and sale, the deed of the Trustees to the purchasers, the deed of the purchasers to the first Wilmington and Northern Railroad Company, and by the articles of merger between it and the Pennsylvania corporation.

*Chas. B. Lore, George H. Bates* and *Austin Harrington,* for the defendant :

## THE CORPORATE EXISTENCE OF W. & R. R. R. Co., WAS TERMINATED BY THE LEGISLATURE.

By an act passed February 22, 1877, (15 *Del. Laws,* 519,) the Legislature, after reciting the sale of the Wilmington and Reading Railroad, terminated the corporate existence of the Wilmington and Reading Railroad Company, and vested in a new corporation, the Wilmington and Northern Railroad Company, all the corporate rights, powers and franchises which had previously been enjoyed under the laws of this State by the Wilmington and Reading Railroad Company.

From and after the passage of this act the Wilmington and Reading Railroad Company necessarily had no legal existence whatever. All its powers, privileges and corporate capacities were divested and had ceased to exist as effectually as if they had never been granted.

The act of February 22, 1877, (15 *Del. Laws,* 5 19,) was to all intents and purposes a dissolution of the corporation of the Wilmington and Reading Railroad Company, and a repeal of its charter. It recites the sale of the railroad and its appurtenances, an amply sufficient cause for the withdrawal of the corporate privileges and franchises which had been conferred upon that corporation for the sole purpose [of enabling it to operate a railroad. The act then proceeds to confer upon the new corporation created for the benefit of the purchasers the *identical* rights, powers, immunities, privileges and franchises of the old corporation. If it had been the intention of the legislature to leave the old corporation in existence and simply to endow the new corporation with *the like* powers, privileges and franchises, it would have been easy to express such an intention with precision.

The only reasonable construction of the act is that it was in-

tended to put an end to the corporate existence of a body which had no longer any railroad or property to operate or administer.

The power of the Legislature to revoke the corporate powers of the company, is settled in this State.

*The Del. R. R. Co. v. Tharp*, 5 Harring., 454.

The Legislature is the sole judge of what is the sufficient cause, but if that could now be examined into, it is apparent that the cause was sufficient, and the facts notorious and matters of record.

Upon the dissolution of the corporation all remedy of its creditors is lost.

*Morawitz on Corp., Sec.,* 559.

And suits brought by or against a corporation are abated.

*Ib. Sec.,* 660.

And all legal remedies to enforce debts due by or to a corporation are necessarily extinguished.

*Ib. Sec.,* 660.

*Commercial Bank v. Lockwood,* 2 Harring. 8.

*Nat. Bank v. Colby,* 21 Wall., 609.

## THE JUDGMENT WAS WITHOUT A PLAINTIFF HAVING ANY LEGAL CAPACITY.

The question whether, after the passage of the act, there was any person or corporation legally capable of being made a new plaintiff in the judgment did not properly arise under the rule in the Superior Court. That question could only be tried upon a *scire facias*, issued upon the judgment by the party claiming the right to be made a plaintiff, in which proceedings defendant would have had an opportunity to raise the question of law and fact involved, to have had an orderly judicial determination of them, and either party would have had an opportunity to take a writ of error if dissatisfied with the result.

To preserve this last mentioned right of review was the main

object of interposing in the Superior Court, the objection that a *scire facias* was necessary. The case, however, having been by the action of the Court, transferred directly to this tribunal, counsel on both sides have agreed to state the questions in such manner as to raise and dispose of at once the main question whether, even under a *scire facias*, the Wilmington and Northern Railroad Company has any right to be made a party to this judgment or to receive its fruits.

The only party which, by any possibility, could set up a claim to be made a new plaintiff, would be the Wilmington and Northern Railroad Company. The first use marked upon this judgment was in favor of that company. The endorsement is an undertaking to vest in that company the equitable title to the judgment and its avails, not by virtue of a right in the latter company, but by the act of the Company which, prior to that time, had ceased to have power to perform any act with respect to it. All the executions issued since that time are in law not the act of the Wilmington and Northern Railroad Company, or of the present *cestui que use*, but they are, if anything, acts of the Wilmington and Reading Railroad Company, as Trustee for the *cestui que use*, and therefore, in legal contemplation, the execution under which this sale was made was in law issued by the original plaintiff, the Wilmington and Reading Railroad Company, more than ten years after all its powers and franchises had been expressly divested by the Legislature and vested in a new corporation. The fact that the indorsements were made by an attorney does not alter the case. The act of the attorney is the act of the principal. It must proceed upon an authority, either expressly or impliedly given to the attorney. No use could be marked upon the judgment in favor of a deceased person after his death by the original attorney of record without suggesting the death of the plaintiff making the executor or administrator a party, and then, any authority which the attorney might have with respect to the judgment would proceed, not from the deceased person but from the legal representative, and any act

performed by him in relation to the judgment would necessarily be as the attorney of the legal representative. The original in-dorsement of a use therefore, is necessarily void because, at the time it was made there was no legal person in being, having power to authorize it, nor from whom any authority to make it could be implied.

That a new party plaintiff could not have been made in this judgment otherwise than by *scire facias* seems almost to obvious for argument. The common law rule is that where a new person is to be benefitted or charged by the execution on a judgment there ought to be a *scire facias* to make him a party to the judgment. (2 *Tidd. Prac.*, 1114.) This rule applies alike to plaintiff and defendant, subject to the sole limitation that, under our Constitution the executor or administrator of a deceased plaintiff may be made a party plaintiff to a suit simply by the suggestion of the death of the plaintiff upon record. Whether the Constitutional provision applies at all after judgment would seem to be very doubtful and not warranted by the language of the Constitution. *Art.* 3, *Const.*, *Sec.* 13.

THE MORTGAGE DID NOT COVER CHOSES IN ACTION.

The Wilmington and Reading Railroad Company had no authority to mortgage personal property otherwise than as it may be found in the legislation of the State concerning that corporation.

3 *Wood on Railway Law*, 1617, (*Sec.*, 464.)

A critical examination of the Acts of Assembly recited in the case stated clearly shows that no such authority, in fact, existed.

It may not be considered out of place to refer to a few cases which show the indisposition of the courts to sustain efforts to mortgage personal property by the use of vague and indefinite language, and also the tendency of the courts to confine the lien of a railroad mortgage to the railroad itself with its appurtenances.

*Dean v. Biggs*, 25 Hun., 122; *Shamokin Valley Railroad Company v. Livermore*, 47 Pa. St., 465; *Calhoun v. Memphis R.*

*R. Co.*, 2 Flip., 442 ; *M. & M. R. R. Co. v. M. & W.* R. R. *Co.*, 20 Wis., 174.

In several cases it was held that net earnings were not covered unless specified.

3 *Wood on Railway Law*, 1621 ; *Pullan v. Cincinnati, &c., R. R. Co.*, 5 Bissell, 237 ; *Emerson v. European, &c., R. R. Co.*, 67 Me., 387 ; *DeGraff v. Thompson*, 24 Minn., 452 ; *Smith v. McCullough*, 104 U. S., 25.

SAULSBURY, Chancellor. " A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality ; properties by which a perpetual succession of many persons are considered as the same, and may act as the single, individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyance for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men in succession with these qualities and capacities that corporations were invented and are in use." Chief Justice MARSHALL'S opinion in the case of *College v. Woodward*, 4 Wheat., 626. A franchise is a certain privilege conferred by grant from the government, and vested in individuals. Corporations or bodies politic are the most usual franchises known to our law. Bouv. Law Dict., 545. By Section 17, Art. 2, of the Constitution of this State, it is declared that " no act of incorporation except for the renewal of existing corporations shall be hereafter enacted without the concurrence of two-thirds of each branch of the Legislature, and without a reserved power of revocation by the Legislature ; and no act of incorporation which may be here-

after enacted shall continue in force for a longer period than twenty years without the re-enactment of the Legislature, unless it be an incorporation for public improvement." The Wilmington & Reading Railroad Company was a private corporation for public improvement, and therefore its existence was not limited to the period of 20 years under this provision of the Constitution. There was no time fixed by positive provision in the charter of the Wilmington & Reading Railroad Company when the corporation should cease to exist. Had there been, the corporation, in the absence of a renewal of its charter before that period, would have become dissolved without either a representative or the possibility of one, as no provision is made by our laws for a representative in such a case ; and at the instant of its dissolution the debts due to it would have become extinguished, not the right to or the remedy for the debts suspended, merely, but the debt itself annihilated. *Bank v. Lockwood's Adm'r*, 2 Har. (Del.), 14. A judgment, being No. 181 to the November term, 1869, was recovered by the Wilmington & Reading Railroad Company, a corporation then existing under the laws of Delaware and Pennsylvania, against the defendants. A *fi. fa.* was issued, being No. 224 to the November term, 1870, on this judgment, and levy made on goods and chattels. Subsequent executions were issued on this judgment, the last being an *alias vend. exp.*, No. 92, to September term, 1887. On May 29, 1886, the judgment was marked for the use of the Wilmington & Northern Railroad Company, by the direction of the attorney of the plaintiff, and the judgment was afterwards, on June 12, 1886, marked for the use of John C. Higgins by direction of the president of the Wilmington & Northern Railroad Company. The defendants allege that at or about the year 1877 the Wilmington & Reading Railroad Company had ceased to have any legal existence as a corporation, or any right to perform or do any act whatever, and that the said judgment which had been recovered by it became void and of no effect.

The sixth reason assigned for setting aside the sheriff's sale is

that the transfers or assignments alleged to have been made by indorsements on the record, and by and through which the said John C. Higgins claims title thereto, were illegal, unauthorized, and void, and ineffectual to vest in said John C. Higgins any right or title whatever. This reason, so far as it relates to the authority of the attorney directing the judgment to be marked to the use of the Wilmington & Northern Railroad Company, is not before us; exceptions thereto having, for the sake of expediting the hearing of the questions reserved, been abandoned; so that the real and only question before us is, was the Wilmington & Reading Railroad Company dissolved by the act in relation thereto passed February 22, 1877; or, in other words, did the Legislature, by passing that act, revoke the charter of the Wilmington & Reading Railroad Company. On the 3d of March, 1868, the Wilmington & Reading Railroad Company executed a mortgage upon its road, etc., for the payment of money. A suit was afterwards instituted in the United States Circuit Court for the foreclosure of this mortgage. The final decree in the case was made April 25, 1876, directing the sale by the trustees of the railroad and property. The sale was made under the decree November 4, 1876. The deed made by the trustees to the purchasers conveyed " the railroad of the Wilmington & Reading Railroad Co., extending from a point on the Philadelphia & Reading Railroad at or near Birdsboro, in the county of Berks, State of Pennsylvania, to the city of Wilmington, in the State of Delaware, with all the rights, privileges, immunities, and franchises of the said Wilmington & Reading Railroad Company, under any and all grants of the State of Pennsylvania, but exclusive of the franchises granted by the State of Delaware." These franchises granted by the State of Delaware were not included in. the mortgage, for which foreclosure was decreed; and of course were not included, but excluded, by the decree of foreclosure. They were not sold by the trustees to the purchasers of said road. Of course, therefore, the purchasers of said Wilmington & Reading Railroad did not by such sale become entitled to said franchises

granted by the State of Delaware.    On the 22d of February, 1877, the Legislature of Delaware passed an act to incorporate the purchasers of the Wilmington & Reading Railroad.    This act, after reciting in its preamble that the railroad of the Wilmington & Reading Railroad Company, with its appurtenances, was sold in pursuance of a mortgage executed by said company under authority of laws of this State, and that it was necessary to the proper enjoyment of the rights acquired by said sale that the purchaser should be incorporated with authority to consolidate with any company organized or to be organized under the laws of the State of Pennsylvania, operating such portion of the road so sold as is situated within the State of Pennsylvania, incorporated the persons purchasing the said Wilmington & Reading Railroad, under a decree of the Circuit Court of the United States for the Eastern District of Pennsylvania, a body politic and corporate, by the name of the " Wilmington & Northern Railroad Company."    By this act the company were vested with all the right, title, interest, property, possession, claim, and demand at law or in equity of, in, and to such railroad, to-wit, the railroad of the Wilmington & Reading Railroad Company, with its appurtenances, and with all the rights, powers, immunities, privileges, and franchises of the corporation as whose property the same was sold, and which may have been granted thereto or conferred thereupon by any act or acts of Assembly whatsoever in force at time of such sale.    These franchises, granted by the State of Delaware, not being included in the mortgage executed by the Wilmington & Reading Railroad Company, and consequently not sold under the decree of foreclosure thereof made by the circuit court of the United States for the Eastern district of Pennsylvania, the purchasers at such sale acquired no title thereto, and no property therein.    If they acquired any such title or property it could only have been under and by virtue of the act to incorporate the purchasers of the Wilmington & Reading Railroad, before referred to. This act purported to vest such purchasers, among other things,

with the privileges and franchises of the corporation as whose property the same was sold, and which may have been granted thereto or conferred thereupon by any act or acts of assembly whatever in force at time of such sale.

The condition of a corporation whose charter has expired is not the same as that of a corporation which has failed to elect its officers, and, as the consequence of that failure, is rendered inactive. The life of the one is out of it by its own constitution, and not from a failure to do what its charter enabled them to do, to give them active being; the other was entitled by its charter to a continued active life, but it has failed to continue that activity by the election of its necessary officers. Its active powers, but not its being, are gone. The one is dead; the other is dormant. The principles of law which apply to the rights of a corporation thus dormant or disabled are not the same as those which are applicable to the rights of a corporation which is dissolved, or civilly dead. In the former case debts due are extinguished; not so in the latter case. No judgment of ouster or other similar judgment, or judgment of like effect, has ever been judicially declared against the Wilmington & Reading Railroad. The act to incorporate the purchasers of the Wilmington & Reading Railroad did not in express terms revoke the charter of the Wilmington & Reading Railroad, nor necessarily deprive the latter of its franchises granted by the acts of assembly of the State of Delaware. The Wilmington & Reading Railroad had never forfeited its charter as judicially ascertained by any judgment of a court of law; and even the former act did not so declare. A franchise is property, and it cannot wantonly or of whim be taken away by a legislative act, and transferred to another. The act of February 22, 1877, must receive a reasonable interpretation. It must be interpreted to mean that which the legislature of the state of Delaware had a right to do, and not that which the legislature had not a right to do. The rights, powers, immunities, privileges, and franchises conferred by the legislature on the purchasers of the Wilmington & Reading

Railroad must be intepreted to be such rights, powers, immunities, privileges, and franchises as those conferred by the legislature on the Wilmington & Reading ʿRailroad by any act or acts of the general assembly which the Delaware legislature had the right to confer, and to vest the same in said purchasers, because the legislature had the right to make such a grant; but the legislature had no authority to take from the Wilmington & Reading Railroad rights, powers, immunities, privileges, and franchises, the same never having been judicially declared forfeited, nor revoked constitutionally by legislative authority. If the legislature had revoked the charter of the Wilmington & Reading Railroad, it could have granted rights, powers, immunities, privileges, and franchises of the same nature and kind as those which the Wilmington & Reading Railroad had theretofore possessed, but not the same identical rights, powers, immunities, privileges, and franchises, because the charter being revoked, it would follow that the rights, powers, immunities, privileges, and franchises ceased and determined, and were not the subjects of transference to another company by legislative grant. The words, " of the corporation as whose property the same was sold, and which may have been granted thereto or conferred thereupon by any act or acts of assembly · whatsoever in force at the time of such sale," must be interpreted as having relation to what was sold, and not to that which was not sold, and could not have been legally sold under the said decree of foreclosure. According to this interpretation, the words used would have force and effect. A contrary interpretation would render the words of the act of assembly inoperative and void.

It appears from the case stated that the judgment in respect to which controversy exists in this case was on May 29, 1886, marked for the use of the Wilmington & Northern Railroad Company by Victor Du Pont, attorney for plaintiff, and on June 12, 1886, for the use of John C. Higgins, by direction of H. A. Du Pont, president of the Wilmington & Northern Railroad Company. It also appears in like manner that there had been no meeting of the

stockholders of the Wilmington & Reading Railroad Company after the sale thereof under the decree of foreclosure aforesaid. If these facts be so, the Wilmington & Reading Railroad as a corporation was not dead, nor the debts due it extinguished, so far, at least, as it existed under the laws of the state of Delaware. In this respect it was only dormant; capable of being revived, but incapable of action without such revival. Its life or death rested with the legislature. The views above expressed in reference to extinct and dormant corporations are in accordance to the opinion of the court in the case of *Bank v. Loockwood's Adm'r.* "There, is," says *Morawetz,* (*Priv. Corp.,* §§ 1002, 1003,) "a broad and fundamental distinction between the dissolution of the corporation and the loss of its franchise or legal right to exist. Much confusion may be avoided," he says, "by bearing in mind this distinction." Again, he says: "If the charter of a corporation limits its existence to a definite period of time, the franchise or right to exist would expire at the time limited." Again: "The franchise to exist and carry on business as a corporation continues indefinitely unless the time of its duration is expressly limited in the grant." If the corporation should be guilty of any wrongful act, or neglect of duty, which would give the state a right to declare the franchise forfeited, the franchise would nevertheless continue until the forfeiture has been claimed and enforced by the state through the proper legal proceedings. The commission of a wrongful act or neglect of duty by a corporation would evidently not *per se* put an end to the actual existence of the corporate association. After a long-continued non-user it may be presumed that a corporation has surrendered its franchises to the state; but the mere fact that a corporation has been without officers or organization, and has performed no corporate acts during a number of years, does not put an end to its franchises, although this may be a good ground for declaring them forfeited by judicial proceedings. The charter of a corporation does not expire by reason of the omission or commission of acts on the part of the company for declaring a forfeiture;

but the franchises continue in full force until the penalty of forfeiture is claimed by the state granting the franchise, and this can be done only through a legal proceeding by which the cause of forfeiture is judicially ascertained, and not in a purely collateral proceeding. Says *Pierce*, (*R. R.* 11 :)   " The non-use or misuse of its franchises by a corporation, or its breach of the conditions on which its duration is by the law of its creation made to depend, is a cause of forfeiture.   Such defaults, however, do not of themselves work a forfeiture, but they take effect only when judicially determined in a direct proceeding instituted for the purpose.   A non-user or misuser is a ground of forfeiture although not expressly declared to be such by statute."   The same writer says:   " A cause of forfeiture which has not been judicially declared in a direct proceeding cannot be taken advantage of collaterally."   The legal modes of proceeding against a coporation for usurpation,—non-user or misuser of a franchise,—is *scire facias*, or an information in the nature of a *quo warranto*; each prosecuted at the instance and on behalf of the state.

What becomes of the corporate property of a corporation in the event of its dissolution?   The court in the case of *Bank v. Lockwood's Admr's*, before referred to, say that on the dissolution of a corporation as by the expiration of the period of its charter, its real estate reverts to the grantor, its personal estate to the people, and the debts due to it are extinguished.   This is doubtless so at the common law, and in a proceeding at law as a *scire facias* on a judgment; but the more modern doctrine upon this subject seems to be that the capital of a corporation becomes upon its dissolution a fund to be administered in equity for the payment of its creditors, and afterwards for distribution among its stockholders.   The creditors have a lien on the assests, and may follow them into the hands of stockholders and persons who are indebted to the corporation.   The rights of stockholders in the assests are subordinate to those of creditors.   See *Pierce R. R.* 13, and authorities cited.   In my opinion, when the constitution of this state speaks of the re-

served power of revocation of a corporation by the legislature, it means an express revocation by the legislature, and not otherwise.

It will be seen from what I have already said that the judgment set forth in the case stated, being No. 181 to the November term, 1869, of the superior court, whether it be a valid and subsisting judgment or not, did not pass to the Wilmington & Northern Railroad Company by virtue of the acts of assembly, mortgage foreclosure proceeding, sale and conveyance recited in the case stated, so as to give the said Wilmington & Northern Railroad Company the right to enforce said judgment by execution issued against the defendants, and that John C. Higgins, who claims to be the assignee of said company to said judgment, has not the right to enforce said judgment against the defendants.

COMEGYS, C. J., concurring:

The questions which the case stated, as amended, presents for our opinion, are thus expressed in the record from the Superior Court for New Castle County :

*First.*—Whether the judgment set forth in the case stated, being No. 181, to the November Term 1869, of the said Superior Court, is a valid and subsisting judgment.

*Second.*—If the said judgment is a valid and subsisting judgment, did the title to the same pass to the Wilmington and Northern Railroad Company by virtue of the acts of Assembly, mortgage, foreclosure proceeding, sale and conveyances recited in the case stated, so as to give the said Wilmington and Northern Railroad Company the right to enforce said judgment by execution issued against the defendant.

Although by the 20th section of the charter of the Wilmington and Brandywine Railroad Company, (12 Vol. Del. Laws, 142,) power was given it from time to time to borrow money for corporate purposes and to execute mortgages of all its estate real and personal, and to issue bonds to secure the payment of the same ;" and

by the 3d section of the act consolidating that company with the
Pennsylvania Company, making one company, and incorporating it
as the Wilmington and Reading Railroad Company, it is provided
that, by the consolidation and merger of the companies, they shall
be one corporation possessing within this state all the rights, privi-
leges, and franchises, and subject to all the restrictions, liabilities
and duties of such corporations, companies, or railroads consoli-
dated or merged," yet the 6th and last section of such charter re-
stricts the subject of mortgage to *real estate* of such consolidated
company and like as such features in legislative acts are
considered, may be taken to control the prior general pro-
vision. This seems to be the law as given at the close of
page 658 of Dwarris on Statutes (9 *Law Lib.*) But whether that
be correct or not, the general power in the charters of the compo-
nents of the consolidated corporations could not properly be held in
this state, to include debts or choses in action under the term per-
sonal estate; which, here, has been considered, in its ordinary
acceptation or meaning, to apply to corporal personal property—
that is, moveable goods, or those chattels which a sheriff can levy
upon with a fieri facias, which he can impound, and which he can
sell and deliver to a purchaser: certainly a debt cannot be levied
on with a fi, fa. Although a corporate franchise of toll may be
subject to seizure by execution, yet this is a special provision of the
statutory law of corporations, and does not affect the rule in any
other respect. The decree of the Circuit Court of the United
States in the suit against the trustees in the mortgage of the Wil-
mington and Reading Railroad Company to compel a sale of the
mortgaged property, expressly excepted from its operation the Del-
aware franchise as not included in any power to mortgage given by
the State. This favors the view that, by the 8th section of the
consolidation act before quoted, nothing but real estate could be
mortgaged under Delaware authority. That section is in these
words: " And that the said corporation may, from time to time,
borrow money for corporate purposes and uses, and execute mort-

gages on all or part of their real estate, and issue bonds to secure the payment of the same."

The only clause or provision, therefore, as appears to be the reasonable view to take, which clothed the Delaware and Reading Railroad Company (the consolidated company which made the mortgage) with power to bind itself by mortgage is that just quoted from its own charter. Whatever the mortgage could include, under that power was mortgaged to Trustees, and nothing more.

It is not simply a question of intention, where courts, dealing with transactions between man and man, will look beyond their mere letter, if the rules of law will allow them to do so, to reach their true purpose (their being no question of *vires*); but one only to be settled by language, taken in its obvious sense, when found in legislative acts. And no difficulty of interpretation, with respect to them, where they concern the powers conferred upon corporate bodies to borrow money, can arise, when there is constantly kept in view the fact that corporations have no inherent power, as such, to borrow money at all. They are supposed to be capable, out of the proceeds of the sales of their shares to subscribers, to provide themselves with all money necessary to promote the object of their creation. Hence it is, that power to borrow money and secure the payment of it, is made an express provision of such charters as create railroad companies and other trade corporations.

It being a rule of law, with respect to corporate bodies generally, that they have no powers but such as are granted to them expressly, or are necessarily implied as concomitants of the granted powers, I find nothing in that part of Section 6 (above quoted) of the consolidation act, which would justify us in holding that anything was intended to be made the subject of mortgage by the Wilmington and Reading Railroad Company but its real estate—its lands, tenements, and hereditaments.

This general view of the *vires* of corporations was in the mind of the Circuit Court of United States, no doubt, when it excluded

from the operation of the decree the franchises granted by the State of Delaware.   It is not pretended that they were sold.   The road-bed and all upon it went by the sale : that is, the right (whatever it was) of the Wilmington and Reading Railroad Company to the land of its highway and everything upon or attached to it as part of the freehold, passed to the purchasers under the foreclosure sale, but nothing else under the authority of the Delaware act: for the decree could not operate in Delaware to subject to sale any property of its creation, or within its jurisdiction exclusively, but that authorized to be mortgaged by the act of February 7, 1866, viz : *real estate*.   Neither a franchise, nor a chose in action, or any purely incorporeal right, depending for its existence upon Delaware law, could be the subject of a mortgage, confined by the terms of the power to make the instrument, *to real estate*.   In this view, the purchasers of the property of the Wilmington and Reading Railroad Company, sold under the decree of the Circuit Court aforesaid, did not take the judgment against the Downwards.   As there was no power by the act of 1866 to mortgage, or pledge, that judgment, it could not be a subject of the mortgage sale : therefore it remained, as before the sale, a judgment belonging to the Wilmington and Reading Railroad Company.·   Now what was the effect of the sale, under the decree of the Circuit Court, upon the property of the Wilmington and Reading Railroad Company within this State?   That question I have already answered by stating that it did not touch the franchises of the company, nor a chose in action or any purely incorporeal right depending for its existence upon the law of this State.   The argument of the learned counsel for the defendants raised no contention to the contrary of this : but they do insist that the effect of the sale was a virtual annulment of that company's legal entity, and that the act incorporating the purchasers under the sale made by said decree, operated its entire extinction.   In other words, they claim that, at the time of the transfer of the Downward judgment to the Wilmington and Northern Railroad Company (the new corporation) there was not in existence,

for any purpose, the Wilmington and Reading Railroad Company in whose behalf it was recovered : and, therefore, there could be' no authority given to, or held by him who was the attorney of the company when it was a vital body, to make the transfer. The question is then presented—what effect had the sale, and the act incorporating the purchasers under it, upon the life of the Wilmington and Reading Railroad Company ? If they destroyed it, then, of course, all acts done in its behalf afterwards, or on its account, were pure nullities.

The counsel for the *cestui que use*, however, denied that the corporation of the Wilmington and Reading Railroad Company was defunct by such agency or influence ; and argued to this effect, though by different language,—that nothing in and of this State exclusively, except the real estate of that company, could be touched by the sale ; that every franchise or right it had which was not necessarily involved in the sale of such estate, remained as its property : and 'that' the act of the legislature incorporating the Wilmington and Northern Railroad Company and clothing it with all the former company's " right, title, interest, property, possession, claim and demand at law or in equity of in and to such railroad with the appurtenances, and with all the rights, powers, immunities, privileges, and franchises of the corporation as whose property the same was sold, and which may have been granted thereto, or conferred thereupon, by any act or acts of the Assembly whatsoever in force at the time of such sale " &c., did not divest the Wilmington and Western Railroad Company of any property whatever.

It is not contended by the defendant's counsel that the legislature, in and by the act incorporating the Wilmington and Northern Railroad Company, intended to exercise its constitutional powers of revocation of charters. It is only reasonable to suppose that when such a course is intended in any case it will be marked by legislative language of purpose, direct and not inferential. While the Constitution makes no requirement of form, or method, for the act, yet, in view of the nature of such a stupendous power, and the

consequences to flow or ensue from its exercise, a legislature (it is fair to presume) would not leave its purpose so uncertain as to require the aid of one of its own courts to ascertain and declare it. There would be some expression, in some form or other, that the act relied upon to create revocation, was intended for that purpose. I do not mean to be understood as saying that the legislature may not adopt its own method of revoking a charter : but I do believe the act would seem to the body to require expression of purpose to revoke, and would have such purpose distinctly put forth therein. And, looking at the subject in this light, I do not think any court of this State should yield to a mere inference of design to revoke, when language importing purpose of revocation is wanting. The proper view, I think, is, that the legislature, by the act of February 22, 1877, did not intend to revoke the charter aforesaid, but only that which is plainly expressed, as quoted above. Whether there was any power in that body to dispose of the property of the Wilmington and Reading Railroad Company, is a question, it would seem, not very difficult to answer. It is quite plain that the General Assembly which passed the act of February 22, 1877, did not suppose that the sale by the Trustees under the decree of the Circuit Court of the United States, passed anything more than the actual real estate of the Wilmington and Reading Railroad Company. This is evident from the preamble to the act, which is in these words : " Whereas under and by force of a decree of the Circuit Court of the United States for the Eastern District of Pennsylvania, the Railroad of the Wilmington and Reading Railroad Company, with its appurtenances, was sold in pursuance of a mortgage executed by said Company under authority of the laws of this State, and it being necessary to the proper enjoyment of the rights acquired by the said sale, that the purchasers should be incorporated with authority to consolidate with any company organized or to be organized under the laws of the State of Pennsylvania operating such portion of the road so sold, as is situated within the State of Pennsylvania.

Therefore &c."

The General Assembly were correct in this; for it was only real estate it had given the Company power to mortgage, and only that which could be sold in execution of the mortgage, or in fulfilment of the trust contained therein.  But the legislature of 1877 undertook, in and by the act incorporating the purchasers under the sale by the United States Circuit Court decree, to grant to the Company created the same property they had bought at the sale, that is, "the railroad and its appurtenances," and also "all the rights, powers, immunities, privileges and franchises of the corporation as whose property the same was sold, and which may have been granted thereto, or conferred thereupon by any act or acts of assembly whatsoever in force at the time of such sale" &c.   This, I respectfully submit, amounted of itself to nothing, so far as the railroad was  concerned ; for the corporators owned that already.  As to the other subjects of the intended grant, as they were not capable of being sold under the decree, because not included in the mortgage, they remained the property of the Wilmington and Reading Railroad Company, only to be divested by State legislation in one of two ways—either by revocation of its charter, which in my opinion was not done by force of the act incorporating the new company, or any implication arising out of the above quoted langauge from it, or by exercising the right of eminent domain— which exercise is always by direct proceedings authorized for that purpose with provision for payment of the property taken.   The act is alike silent as to revocation and taking by eminent domain.

It is very difficult to suggest any plausible reason even for the futile grant, except it be that the agent of the new company who framed the bill had not fully looked back into the legislation concerning the Wilmington and Reading Railroad Company to see what it was that the company had power to mortgage; or, if he had, that he had not considered that the franchises of the company were still left to it.  As the language of the act quoted above is the same precisely as that of the mortgage where descriptive of the property mortgaged, and of the deed also most probably to the

purchasers, he might well have been misled by such language, and supposed that everything in Delaware, as well as in Pennsylvania, had been sold. But, as I have pointed out, the mortgage bound nothing in Delaware but real estate, and of course the sale covered nothing else.

To make the clause of the act of 1877 above quoted a reasonable enactment (that is the duty of this Court, if it can find means of doing so) we might construe it as being intended to bestow on the new corporation like capacity and privileges, immunities, franchises, &c., as those held by the Wilmington and Reading Railroad Company. But, however, we may think with respect to that, it is perfectly certain that the sale under the decree did not divest the company of anything but its real estate ; nor could the clause of the new charter under consideration operate to that effect, for it neither revoked the former charter, nor did it provide for the exercise of the power of eminent domain with reference to the property not included in the mortgage. Adopting then what seems to be the true view—that neither debts, nor choses in action, nor franchises were, by Delaware authority, included in the mortgage of the consolidated company, they could not pass by any sale under such mortgage; and, in fact, did not pass by the sale made to the future corporators of the Wilmington and Northern Railroad Company on the 14th of December, 1876.

It does not appear by the case stated, nor was this Court informed in the argument when the debt was created by the Downwards upon which judgment in the Superior Court of New Castle County was recovered at the November Term, 1869. The mortgage, however, was made eighteen months before that time, and could not include the judgment ; nor, upon the view that that instrument covered nothing but real estate, could the cause of action which supported the judgment have been embraced by it. And, independent of that view, upon the reasoning heretofore put forth, nothing incapable of manual tradition upon a sale by *fi. fa.* could be considered as personal estate, the subject of mortgage. Mort-

gages of goods and chattels in Delaware were never made, much less formally legalized or recognized, until the act of March 23, 1877 (15 Vol. Del. Laws, 616).—Having thus determined that the judgment against the Downwards did not pass by the sale, by virtue of the decree of the United States Circuit Court to the purchasers of the Wilmington and Reading Railroad property, it remains to consider the other branch of the question submitted to this Court, which is—whether the said judgment is a valid and subsisting judgment?

Reply to that question could easily be made by saying, as the judgment does not appear ever to have been paid or satisfied, it is necessarily valid and subsisting at law. This, however, would not answer the real ends of the case as presented to us in the argument. Neither the learned counsel for the defendants, nor the counsel of the plaintiff, make any contention to the contrary of the view above taken of the mortgage sale ; but the former contended that the effect of the act to incorporate the purchasers at such sale as " The Wilmington and Northern Railroad Company " was to extinguish and annul the existence of the old corporation of the Wilmington and Reading Railroad Company. They rely upon the phraseology of Section 1 of the act which grants to the former the property of the latter by this language " all its rights, title, property, interest, claim and demand at law or in equity of in and to such railroad, with the appurtenances, and with all the rights, powers, immunities, privileges, and franchises of the corporation as whose property the same was sold, and which may have been granted thereto, or conferred thereupon by any act or acts of Assembly whatsoever in force at the time of such sale " &c.

It is not pretended that the judgment itself was extinguished by the act of February 22, 1877—the first section of which in part has been quoted : the point made being merely that the Wilmington and Reading Railroad Company had no legal existence, and therefore could do no legal act, by attorney, or otherwise, at the time the transfer was made to the Wilmington and Northern Railroad

Company.   In reply to this it is sufficient to say that the first point has already been passed upon adverse to such view.   The questions presented by the case do not call for any expression on the latter.

Upon the facts as stated to us by the Superior Court of New Castle County, I am of opinion that for anything that has been shown to the contrary in the argument before us, the judgment in controversy is a valid and subsisting judgment: and that the title to the same did not pass to the Wilmington and Northern Railroad Company by virtue of the acts of assembly, mortgage, foreclosure proceeding, sale and conveyances recited in the case stated, so as to give the said Wilmington and Northern Railroad Company the right to enforce said judgment by execution issued against the defendant.